IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| JOE SCHROEDER LEGACY, LLC, f/k/a DRYCO, LLC, JOSEPH SCHROEDER, PAUL MATTHEWS, and JOHN SCHROEDER, | ) ) ) ) ) | |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | Case No. |
| SERVICE247 OF ILLINOIS, INC., an Illinois corporation, CLAIMPLUS CORPORATION, a Texas corporation, NELSON GROUP, INC., a Texas Corporation, HANSON LAW GROUP, LLP, an Illinois Limited Liability Partnership, THOMAS KEFFER, ELIZABETH NELSON, and DAVID FOREMAN, | ) ) ) ) ) ) ) ) ) | |
| *Defendants,* | ) ) | |
| And | ) ) | |
| SPECIALTY CONTENTS GROUP, LLC d/b/a CONTENTS RECOVERY EXPERTS, an Illinois limited liability company, | ) ) ) ) ) | |
| *Nominal Defendant.* | ) | |

## **COMPLAINT**

Plaintiffs, Joe Schroeder Legacy, LLC, f/k/a DRYCO, LLC ("DRYCO"), Joseph Schroeder, Paul Matthews, and John Schroeder, by their attorneys, Tarpey Wix LLC, and for their complaint against Defendants, Hanson Law Group, LLP, Thomas Keffer, Elizabeth Nelson, Nelson Group, Inc., Service247 of Illinois, Inc., Claimplus Corporation, and David Foreman, state the following:

## INTRODUCTION

1.     Defendants have hatched a fraudulent scheme to hijack control and raid the assets of a company founded by DRYCO and Plaintiffs, Joe Schroeder, John Schroeder, and Paul Matthews, called Specialty Contents Group, LLC d/b/a Contents Recovery Experts ("SCG"). In so doing, they have wrongfully converted assets and funds belonging to Plaintiffs and SCG and unlawfully usurped SCG's business opportunities for the benefit of competitors.

2.     In 2015, DRYCO formed SCG with James Ko for the purpose of recovering and restoring property damaged by flooding, fire, or other calamity. DRYCO was 50% owner of SCG. An entity controlled entirely by James Ko, Countryside Cleaners, Inc. ("CCI"), is also a 50% owner of SCG. Since early 2017, Ko has also been the manager of SCG.

3.     Defendants Elizabeth Nelson ("Nelson") and Thomas Keffer ("Keffer") are the CEO and President, respectively, of Claimplus Corporation, a direct competitor of SCG. Nelson is also the principal of Nelson Group, Inc. ("Nelson Group"). Nelson and Keffer have set up another direct competitor to SCG, Defendant Service247 of Illinois, Inc. ("Service247"). (Nelson, Keffer, Nelson Group, and Service247 shall from time to time be referred to collectively as the "Service247 Defendants.") Defendant, David Foreman, is an employee of SCG and an operative of Nelson and Keffer. The Service247 Defendants and Foreman have orchestrated a raid on SCG. Using Ko, they have conspired to hijack the assets, customers, opportunities, and good will of Plaintiffs and SCG for their own benefit and deliver them to Service247 and Claimplus—SCG's competitors.

4.     For their part, Defendants, Hanson Law Group, LLP, Kyle Hanson, and Keith Hanson, are SCG's attorneys, or at least they were supposed to be. As such, they had a duty to act in SCG's best interests. Instead, they actively and knowingly assisted Ko and the other

Defendants in their raid of SCG, to the detriment of SCG and Plaintiffs. In so doing, they breached their legal, fiduciary and ethical duties to their client, SCG.

## PARTIES, VENUE, AND JURISDICTION

5.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b) because Plaintiffs and several Defendants reside in this District and the events at issue largely took place in this District. This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 because the matter at issue arises under the laws of the United States. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

6.     Plaintiff, DRYCO, is an Illinois limited liability company with its primary place of business in Downers Grove, Illinois.

7.     Plaintiffs, Joseph Schroeder, Paul Matthews, and John Schroeder (the "DRYCO Members"), are Illinois residents and members of DRYCO and SCG.

8.     Defendant, Service247 of Illinois, Inc., is an Illinois corporation with its primary place of business in DuPage County, Illinois. It also maintains an office at 122 W John Carpenter Freeway, Ste. 175, Irving Texas 75039.

9.     Defendant, Claimplus Corporation ("Claimplus"), is a Texas corporation with its primary place of business at 122 W John Carpenter Freeway, Ste. 175, Irving Texas 75039.

10.     Defendant, Nelson Group, Inc. ("Nelson Group"), is a Texas corporation with its primary place of business at the same location as Claimplus—122 W John Carpenter Freeway, Ste. 175, Irving Texas 75039. Ko, Nelson, and Keffer caused SCG to funnel cash and opportunities to the Nelson Group, Claimplus, and Service247.

11.     Defendant, Thomas Keffer ("Keffer"), is a Texas resident, President of Claimplus and de facto manager of SCG.  He has advised James Ko in his campaign against SCG.  On information and belief, he is an undisclosed partner of James Ko and CCI.

12.     Defendant, Elizabeth Nelson ("Nelson"), is a resident of Texas and the CEO of Claimplus and has been held out to the public as the CFO of SCG.  Together, Nelson and Keffer have orchestrated the raid of SCG's assets to benefit their competitor companies.

13.     Defendant, Hanson Law Group, LLP is an Illinois limited liability partnership with its primary place of business in Barrington, Illinois.  At all relevant times, Hanson Law Group was retained to provide legal representation to SCG.  Kyle and Keith Hanson were the attorneys primarily responsible for advising SCG.  (Hanson Law Group and Kyle and Keith Hanson will henceforth be referred to collectively and interchangeably as the "Hansons" unless otherwise specified.)

14.     Defendant, David Foreman, is a resident of Cook County, Illinois, an employee of SCG, a de facto manager of SCG, and, on information and belief, an undisclosed partner of James Ko.

15.     Nominal Defendant, SCG, is an Illinois limited liability company with its primary place of business in Downers Grove, Illinois.

16.     Demand was not made on SCG's manager, James Ko, to cause SCG to bring the claims asserted derivatively herein because the claims directly implicate Ko's wrongdoing.  As the manager, Ko has sole authority under SCG's operating agreement to cause SCG to bring the claims.  Plaintiffs will adequately represent SCG's interest because they are 50% owners of SCG; the claims implicate the wrongdoing of the other 50% owner; and, as Plaintiffs contributed

100% of the funds to start and operate SCG, they are the only parties financially invested in SCG's success.

**FACTS COMMON TO ALL COUNTS**

**a. DRYCO Contributes 100% of SCG's Capital — More than $1 Million.**

17.     In 2015, DRYCO formed SCG with Ko.  DRYCO was a 50% owner and Ko's entity, CCI, is a 50% owner.  Exhibit A, Operating Agreement of SCG.

18.     DRYCO contributed 100% of the start-up capital to SCG.  Under the Operating Agreement, DRYCO also agreed to provide a space for SCG to maintain its headquarters.  Ex. A at ¶ 5.10(D) and (E).  The Operating Agreement required CCI and DRYCO to agree on a budget to repay DRYCO for these costs.  *Id.*  Once these costs were repaid, title of the equipment utilized by SCG would pass from DRYCO to SCG.  *Id.*  Until then, however, DRYCO retained ownership of all equipment.  Defendants, however, ensured that the obligation to DRYCO was never repaid, however, and instead converted the assets and opportunities of SCG for their benefit by surreptitiously handing them to the Nelson Group, Claimplus, and SCG.

19.     As part of this arrangement, DRYCO leased an additional 18,747 square feet of an industrial property located at 5402 Janes Avenue in Downers Grove, Illinois, where it already leased 25,625 square feet.  DRYCO and SCG agreed that SCG was to pay DRYCO the monthly rent on the property and DRYCO, in turn, would pay the entire rent to the landlord.  SCG utilized 71% of the total 44,372 square feet and charged SCG exactly that amount of the lease—71%.  Ko was fully aware of this arrangement as it was being negotiated and Ko approved of it.  DRYCO paid the first four months of rent because, according to Ko, SCG had no revenue.

20.     DRYCO's contribution to SCG, and SCG's obligation to repay DRYCO, are acknowledged in SCG's tax returns, third-party reviewed financial statements, and in a Secured

Promissory Note ("DRYCO Note") and Security Agreement ("DRYCO Security Agreement"), both dated September 30, 2016. See Exhibits B and C (tax returns); D and E (financial statements); and F and G (Note and Security Agreement).

21. Originally, the plan, as agreed by all, was for Ko to drive business development. In negotiating the joint venture with DRYCO, Ko had repeatedly boasted of the growth he had driven in his parents' dry-cleaning business. In sum, DRYCO would put up the capital and Ko would earn his ownership interest through business development. Unfortunately, Ko proved to be an unwilling and ineffective salesperson. He simply did not put in the time and effort necessary to generate business.

**b. Ko Proves to be an Ineffective and Irresponsible Manager of SCG.**

22. One of DRYCO's original members, Burgess Watts, was the initial Manager of SCG. When Ko proved to be an ineffective salesperson, DRYCO moved him to an operational role. In February 2017, DRYCO decided that Ko could replace Watts as the Manager of SCG. The plan being that since Ko had failed at developing new business and expanding existing business, perhaps he was better suited to contribute operationally.

23. Through the capital provided by Plaintiffs to SCG, Ko was paid a salary, which he incredulously continues to receive to this day. Unfortunately, Ko proved ineffective and totally irresponsible as a Manager and from an operational standpoint as well. He simply refused to participate in the day-to-day functions required to manage a business and refused even to come into the office on a daily basis. He would come to the office once or twice per week for a couple hours. Simply put, he refused to do any work. Ko's neglect had serious financial consequences for SCG. SCG quickly began bouncing checks and defaulting on obligations to major customers, business partners, and lenders.

24.     Then, Ko became openly hostile to DRYCO in mid-2018.  Around February 2018, Ko began to lobby to open an SCG office in California, ostensibly to service customers who had suffered property damage due to the California wildfires.  Ko became irate when he was informed that SCG did not have the capital to open a new office in a distant locale.  In fact, by that time, SCG nearly exhausted its working capital line and DRYCO had to inject an additional $300,000 to keep SCG afloat.  The proposal to open a California office was even more untenable because Ko could not manage the existing operation, let alone a new office far from headquarters.  In reality, Ko wanted to open a California office to bail out his parents' competing (but failing) franchise with SCG funds.  Ko's parents had opened a franchise location in California of "FRST Team," a competitor of SCG.  DRYCO would eventually come to learn that, once Ko had been told that SCG could not open an office in California, he began to email SCG personnel in attempts to undermine the company's founders, Joe Schroeder and Paul Matthews, and strategize with third parties as to how he could wrest control of the company from them.

25.     In order to right the ship, Joe and Paul advised Ko in June 2018 that he should no longer be the Manager of SCG and it was time that Ko and SCG part ways. In response, Ko instead attempted to leverage powers he believed were granted him in the SCG Operating Agreement to intentionally injure DRYCO and SCG and to create business opportunities for himself and his Defendant co-conspirators.  Essentially, Ko began to blatantly betray and defraud his business partners under the guise of exercising his powers as Manager of SCG.

**c.  The Hansons Conspire with Ko to Seize Control of SCG.**

26.     The Hansons have been enthusiastic conspirators and abettors with Ko since the earliest days of his campaign against SCG.  The Hansons' client, by engagement, was SCG.

Nonetheless, the Hansons chose to conspire with Ko, to the detriment of SCG, because they knew that they would be fired if Ko was relieved of his duties as manager. The Hansons wanted to ensure that Ko could keep paying the legal fees billed by the Hansons out of SCG's money. Thus, they effectively became Ko's private consultants and confidantes in the conspiracy against SCG and DRYCO—in flagrant violation of their fiduciary, legal and ethical duties to SCG.

27. First, on information and belief, the Hansons advised Ko to cause SCG to stop paying rent on the Janes Avenue property in the third quarter of 2018 and Ko did so. Their hope was that, because DRYCO was on the lease, stopping SCG's rent payments would imperil DRYCO with the risk of a deficiency judgment and, thus, would give Ko further leverage over DRYCO. SCG eventually received an eviction notice from the landlord in October 2018. The landlord then filed a complaint against SCG seeking eviction in DuPage County, Case No. 2019-LM-000808.

28. Next, on information and belief, the Hansons advised Ko to approach SCG's lender, Signature Bank, and remove Joe Schroeder, Paul Matthews, and Koreen Hux's signatory authority over SCG's bank accounts. Ko did so on June 11, 2018. Matthews and Schroeder are members of DRYCO. Koreen Hux was SCG's CFO.

29. Ko went into a Signature Bank branch and began ranting and raving about his control over SCG's accounts. He made such a scene that a teller called SCG's loan officer, Tim Hanson, who in turn called Joe and Paul. After this scene, Ko made a number of outlandish demands on Signature Bank regarding SCG accounts. Signature Bank requested a meeting to discuss Ko's erratic behavior and demands but Ko skipped the meeting. Ko also refused to provide Signature Bank a sales forecast despite being repeatedly requested to do so. Eventually, Ko's erratic behavior caused Signature Bank to lose confidence in him and SCG and declare a

material adverse change which caused the loan to become due prior to the term contemplated by the loan documents.

30.     On information and belief, the Hansons also advised Ko to deny Plaintiffs access to SCG's books and records, in violation of section 7.1 of the Operating Agreement and the Illinois Limited Liability Company Act and refused to provide any documentation of the services that the Hansons were providing to SCG.  The Hansons in fact were the ones to communicate Ko's refusal. Of course, at all relevant times, Ko used SCG funds to pay the Hansons tens of thousands of dollars in legal fees and DRYCO, as a 50% owner of SCG, was entitled to see the Hansons billing statements to justify the payments Ko was making on behalf of SCG to the Hansons.

31.     Section 5.10(D) and (E) of the Operating Agreement requires SCG to repay DRYCO for the costs DRYCO incurred in starting up SCG and the capital DRYCO contributed and mandates the DRYCO owns SCG's equipment until the expenses are paid off.  Ex. A.  SCG was to make payments of $40,000 per month until the note was paid which should have occurred by mid-2018.  SCG made a few payments of $40,000, but then was unable to make the required payments to DRYCO.

32.     Because DRYCO owns the equipment that SCG uses and Ko refuses to repay DRYCO as required by the Operating Agreement, DRYCO has demanded its property be returned.  On information and belief, the Hansons advised Ko not to return the property.  As will be discussed below, Defendants then caused the equipment to be given to the Nelson Group, Claimplus, and Service247 to be used to compete directly against SCG.  The Hansons communicated Ko's refusal to turn over the equipment to Plaintiffs.

33.     When DRYCO demanded that collateral be turned over pursuant to SCG's breach of the DRYCO Security Agreement, on information and belief, the Hansons advised Ko not to deliver the collateral.  Again, the Hansons communicated the refusal to Plaintiffs.

34.     Even setting aside the specific advice the Hansons may have given Ko regarding these events, it is beyond dispute that the Hansons were aware of the foregoing events as they were unfolding and did nothing to stand up for SCG's interests.  To the contrary, they actually advocated for Ko's interests, which were adverse to SCG's, and enabled the raid on SCG in the process. The Hansons even went so far as to aggressively negotiate a settlement for Ko, personally.  The Hansons demanded a payment of $537,345 to Ko for "past wages and such that are owed by SCG to James [Ko]" in an email exchange on July 18, 2018. They argued that Ko should receive a large settlement because "he is better than average" and threatened that "James would have a wage claim against" SCG, their own client.  The Hansons, however, were supposed to be representing SCG, not negotiating and advocating for Ko or CCI.  Kyle Hanson even threatened DRYCO, telling its attorneys that "DRYCO should be scared" via email.  The Hansons' conduct constitutes a hornbook violation of their ethical and fiduciary duties to their client.  Bank statements indicate wire transfers for SCG funds to "lawyer" on October 22; November 2, 8, 16, 23, 30; December 7, 14, 21, 28; and January 4, each of $5,000, and one on August 20, 2019 for $10,140.  The "lawyer" account is believed to belong to the Hansons.  In other words, SCG paid the Hansons $5,000 *per week* between October 22, 2018 and January 4, 2019.

**d.  Keffer and Nelson Join the Conspiracy to Hijack SCG.**

35.     Elizabeth Nelson and Thomas Keffer are the CEO and President, respectively, of Claimplus, a direct competitor of SCG.  Exhibit N.  Elizabeth Nelson is also the principal of

Nelson Group. Exhibit O. Nelson and Keffer have set up another direct competitor to SCG, called Service247 of Illinois, Inc. ("Service247"). Exhibit P. They are the directors of Service247. *Id.* Nelson Group, Claimplus, and Service247 share an address at 122 W. John Carpenter Freeway 175, Irving, TX 75039.

36. In August or September 2018, Keffer approached SCG about purchasing it. Initially, DRYCO and Keffer discussed Keffer purchasing CCI's interest in DRYCO. DRYCO had put up 100% of the capital for SCG; had longstanding relationships with several SCG employees; and believed the company would ultimately be profitable. Accordingly, they wanted to remain with SCG and see the vision through to fruition. Overnight, however, Keffer decided to align himself with Ko. Keffer allegedly wanted to package SCG with Claimplus and sell it to a third party. Keffer allegedly promised Ko and Foreman "something that looks like ownership" in the combined entity.

37. Keffer began to hatch a plan to utilize Ko as a pawn who could be easily manipulated in order for Keffer to abscond with the assets and opportunities of SCG without having to pay for them. Ko became quickly entranced by Keffer's apparent wealth and, given his apparent disdain for hard work, Ko was more than happy to let Keffer become the "wizard behind the curtain" and take over operations of SCG by using Ko as his mouthpiece. As a result, Keffer would be able to accomplish his plan of robbing SCG while Ko could stay home every day and keep his salary. Ironically, during the early negotiations, Keffer confided to Joe and Paul that Ko and Foreman were not management material.

38. Indeed, Keffer and Nelson quickly took over major management responsibilities at SCG. For example, in November 2018, Ko fired SCG's CFO and Nelson installed herself as CFO. Then, Claimplus human resources personnel took over several functions of SCG,

including overseeing employees' health insurance policies.  Keffer and Nelson also replaced SCG's IT personnel with his own.  In October 2018, Keffer next attempted to negotiate a lease on behalf of SCG.

39.    When the relationship soured between DRYCO and Ko, Keffer aggressively negotiated on behalf of Ko and sat in on discussions even going so far as to attend court proceedings in Chicago on Ko's behalf.  It was clear that Ko could not make a single decision without advising Keffer and getting Keffer's blessing.  Indeed, even during TRO proceedings between DRYCO and Ko in Illinois state court, Keffer sat in the hallway outside the court room and, through Ko, negotiated what Ko and CCI would be willing to agree to in order to attempt to preserve the status quo.

40.    Keffer and Nelson undoubtedly advised Ko to simply ignore his, CCI's, and SCG's obligations to DRYCO and SCG.  On information and belief, Keffer and Nelson advised Ko to ignore SCG's obligations on the DRYCO Note; to ignore SCG's obligations to repay DRYCO pursuant to section 5.10 of the Operating Agreement; to refuse to deliver to the DRYCO the collateral securing the DRYCO Note; and to refuse to relinquish the equipment that DRYCO owns under section 5.10 of the Operating Agreement.

**e. Defendants, at the Direction of Keffer and Nelson, Are Raiding SCG's Assets.**

41.    At the direction of Defendants, most prominently Keffer and Nelson, Ko is diverting SCG and DRYCO assets as well as SCG's corporate opportunities and employees to the Service247 Defendants, direct competitors of SCG, to benefit Defendants financially.  All of the actions taken below by Ko were part of Defendants' calculated scheme to essentially steal SCG away from the company's founders (Plaintiffs Joe, Paul and John) and were all done at the direction of Keffer and Nelson who used Ko as their puppet to orchestrate the pillage of SCG.

42.     Ko has caused SCG to make numerous payments to the Nelson Group.  For example, statements from SCG's account at Chase Bank reveal wire transfers to an account in Irving, Texas belonging to the Nelson Group on November 16, 2018 ($25,000), January 8 ($5,000), April 15 ($14,500), and May 9, 2019 ($6,270.15).  On information and belief, Ko also caused SCG to transmit checks to the Nelson group in Texas, each for $22,500 on December 5, 2018, February 5 and 21, 2019, and May 3, 2019.

43.     Ko has also diverted work to Claimplus and Service247.  Without consulting Plaintiffs, Ko shut down SCG's Dallas and St. Louis offices and is diverting SCG's revenue-producing jobs from those offices to Claimplus.  Defendants are directing SCG business in Illinois to Service247.  Further, Claimplus and Service247 are using vehicles belonging to SCG, and SCG employees, to perform the work diverted from SCG.  SCG employees moved physical equipment, which belongs to DRYCO, from SCG's headquarters at Janes Avenue and delivered it to Service247.  Simply put, Defendants are stealing assets from SCG and utilizing them to their competitive advantage against SCG.

44.     Ko literally "gave" SCG's Madison, Wisconsin office to Service247 who continues to operate the office using assets from both SCG and Claimplus.  In October 2019, the Madison office of SCG started advertising itself as an office of Service247.  Service247's Madison operation is using SCG vehicles that Ko apparently gave to them.

45.     Ko has also outsourced the entire back-office and administrative operation of SCG to Claimplus.  For example, Claimplus now administers SCG's health insurance plan and Claimplus employees answer the phones at SCG.

46.     In other words, Ko is hand-delivering SCG to Keffer and Nelson on a platter without Keffer or Nelson having to pay a cent for all that went into SCG.  Rather than Keffer and Nelson buying SCG, they have convinced Ko and Foreman to simply give it to them.

47.     On October 22, 2019, Ko informed Joe and Paul that he had unilaterally moved SCG's office from Janes Avenue to a new location in Franklin Park.  This is yet another step in his effort to betray his business partners and give the company to SCG's competitor.

48.     Perhaps most egregiously, Defendants have absconded with SCG's revenue.  SCG collected revenues of between $4 and $5 million, yet it somehow and without explanation has no money right now. This is made worse by the fact that, at Defendants' direction, SCG has not paid any rent on the Janes Avenue property, skipped its health insurance payments for most of 2019, and has not paid many of its business partners.  Thus, it appears that Ko and his conspirators, at the direction of Keffer and Nelson, have simply stolen the money from SCG.  Again, there is no question that the Hansons were aware of the foregoing events as they unfolded.  At best, they sat by and let the Service247 Defendants raid SCG while advocating for Ko against DRYCO.  They certainly have done nothing to stand up for SCG's interests and their advocacy for Ko was adverse to SCG's interest and enabled the raid.  Had they stood up for SCG's interests against Ko, the raid would not have been possible.  More likely, however, the Hansons actively advised Ko to betray SCG, their actual client, and DRYCO for the benefit of the Service247 Defendants.

**f.   The Terms of the Note and Security Agreement.**

49.     Under the Note and Security Agreement documenting SCG's repayment obligation to DRYCO, an "Event of Default" under the Note includes:

> (a) the <u>failure… to pay</u> any amount due and payable hereunder;
>
> (b) the failure of Borrower to perform, keep or observe any term, provision, condition, covenant, promise, provision, representation

or warranty contained in this Note which failure continues <u>following ten (10) days' written notice</u> from any Lender to Borrower hereof;

(c) the failure of Borrower to perform, keep or observe any term, provision, condition, covenant, warranty or representation <u>contained in the Security Agreement,</u> which failure is not cured within the applicable cure period, if any, set forth therein… or

(e) if any of Borrowers assets are, without Borrower's consent or approval, attached, seized, subjected to a writ of distress warrant, or is levied upon or <u>becomes subject to any lien</u>… Exhibit F, ¶ 7 (emphasis added).

50. Upon the occurrence of default, DRYCO has numerous remedies.

"Lender has the right at Lender's sole option, (a) to declare the entire principal balance of this Note together with all accrued and unpaid interest thereon <u>immediately due and payable,</u> (b) to exercise any one or more of the rights and remedies accruing to a secured party under the Uniform Commercial Code of the relevant jurisdiction and any right or remedy available at law or in equity; and/or (c) to exercise any one or more of his rights and remedies <u>under this Note and/or the Security Agreement</u>." *Id.*, ¶ 8.

51.     Under the Security Agreement, SCG's obligations under the Note are secured by all of SCG's assets (the "Collateral"). Exhibit G, ¶ 1. Under the Security Agreement, SCG agreed to keep all Collateral "free from any lien, security interest, encumbrance or adverse claim of any kind whatsoever." *Id.*, ¶ 8(a). SCG also agreed to furnish DRYCO with any requested information about the Collateral and allow DRYCO to inspect the Collateral upon demand. *Id.*, ¶ 8(f). Upon default, DRYCO is permitted to require SCG to deliver all the Collateral to a location of DRYCO's choosing and use the Collateral to offset the debt. *Id.*, ¶ 10(b), (c). SCG waived notice and presentment. Ex. F, ¶ 9; Ex. G, ¶ 10.

52.     DRYCO is entitled to its costs and attorneys' fees in attempting to collect this debt as well as interest at 7% per annum from the date of default. Note, ¶¶ 8, 10.

### g. Defendants Tortiously Interfered with the Note, Security Agreement and SCG's Obligations to DRYCO Under the Operating Agreement.

53.     Defendants tortiously interfered with the Note, Security Agreement and SCG's obligations to DRYCO under the Operating Agreement, deliberately causing SCG to breach its repayment obligations to DRYCO and obligations with respect to the collateral.  First, Defendants caused SCG to breach the Note and Security Agreement by impairing the Collateral. Defendants caused SCG to fail to keep the collateral free from any lien, security interest, encumbrance "or adverse claim of any kind whatsoever." As will be explained in more detail below, the Collateral became subject to adverse claims and liens when SCG defaulted on loans and related security agreements from Signature Bank (the "Signature Bank Loans").  The Signature Bank Loans were also secured by substantially all of SCG assets.  By advising Ko to cause SCG to default on the Signature Bank Loans, Defendants subjected the Collateral to adverse claims by that lender in violation of the Security Agreement.  Ex. G, ¶ 8(a).

54.     Defendants also caused SCG to breach the Note and Security Agreement by refusing to provide information about the Collateral or allow DRYCO to inspect the Collateral, despite numerous requests by DRYCO to inspect the books and records.  *Id.*, ¶ 8(f).  Ko has in fact locked DRYCO out of its headquarters so that it cannot inspect the Collateral, despite numerous requests to do so.  On December 4, 2018, DRYCO's counsel sent the Hansons notice that SCG was in breach of the Note and Security Agreement.  SCG, while being advised by the Hansons, has never cured the various breaches.

55.     On December 18, 2018, DRYCO's counsel demanded that SCG either immediately repay the amount due under the Note or make the Collateral available for DRYCO to pick up.  While being advised by Defendants, Ko refused both demands.  Thus, Defendants caused SCG to breach the Note and Security Agreement by refusing the pay the amount due or

16

deliver the Collateral to DRYCO upon default. As a result, SCG has defaulted on the Note and Security Agreement to DRYCO.

### h. Defendants Tortiously Interfered with Contracts Between Signature Bank and SCG and Subjected DRYCO to Liability in Violation of the Operating Agreement.

56. Defendants also instructed Ko to breach SCG's contracts with Signature Bank and thereby violate the Operating Agreement (section 5.7) by subjecting DRYCO to liability. SCG is the borrower on two loans from Signature Bank: a capital expenditure loan of $750,000 and a working capital loan of $500,000. (The "Signature Bank Loans" unless otherwise specified.) The Business Loan Agreements evidencing both Loans ("Signature Bank Loan Agreements") required SCG to provide Signature Bank a year-end balance sheet within 90 days after the end of each fiscal year and provide a monthly balance sheet and profit and loss statement within 45 days after the end of each month. Exhibit H, p. 3; Exhibit I, p. 3. An "Event of Default" under the Loan Agreements includes failure to make any payment when due or breach of any of SCG's obligations under the Signature Bank Loan Agreements. *Id.*, p. 5. An "Event of Default" also includes a material adverse change in SCG's financial condition, including if the lender believes that SCG is no longer able to perform its repayment obligations. *Id.* Upon the occurrence of any Event of Default, the lender is entitled to immediate repayment of all outstanding "Indebtedness," as well as its remedies under the related Security Agreements and Commercial Guaranties ("Guaranties") attached thereto. *Id.* "Indebtedness" is defined under the Loan Agreements to include any and all outstanding debts. *Id.*, p. 7.

57. Ko provided personal guaranties on both Signature Bank Loans. Exhibits J and K.

58.     Signature Bank declared SCG in default on the Loans on June 28, 2018, believing that SCG had become unable to service its debt and, therefore, that SCG had suffered a material adverse change. Exhibit L.  Among the other facts supporting Signature Bank's declaration of a material adverse change: Ko caused SCG to fail to make timely repayments; Ko caused SCG to fail to pay rent on its office space and received a notice of eviction in October 2018; Ko caused SCG to fail to repay the loans made to it by DRYCO as required by section 5.10(D) and (E) of the Operating Agreement; Ko bounced numerous checks; Ko refuses to make SCG's books and records available; Ko has laid off a large number of original staff, many of whom are guarantors of the Loans; and Ko has locked DRYCO representatives out of the office, though DRYCO contributed 100% of the capital.

59.     Moreover, SCG is in default on the loan even without the material adverse change.  That is because both Loans became due on November 20, 2018 and SCG has refused to repay the Loans.  Ex. H, p. 1; Ex. I, p. 1.  This, of course, is also proof that Signature Bank was right to invoke the material adverse change clause—SCG cannot pay its debts as they become due.  Ko also refused to provide Signature Bank any balance statements or profit and loss statements as required by the Signature Bank Loan Agreements.  As part of their raid, Defendants undoubtedly orchestrated SCG's breach the agreements, subjecting DRYCO to liability in violation of section 5.7 of the Operating Agreement.

**i.  Defendants Tortiously Interfered with and Breached Obligations to Joe Schroeder Under the Signature Bank Loan Agreements.**

60.     In order to prevent Signature Bank from foreclosing on its loans to SCG, Joe Schroeder purchased the loans and succeeded to all of Signature Bank's rights under the loan documents.  Exhibit M.  Likewise, Ko provided a personal guaranty of SCG's obligations under the Signature Bank Loan Agreements.  Ex. J - K.  As part of their power play, Defendants

undoubtedly instructed Ko to breach his obligation to Joe by refusing to satisfy his obligation under the personal guaranty.

### j. Foreman Is an Instrumental Co-Conspirator in the Campaign to Steal from SCG

61. Defendant, David Foreman, is an employee of SCG and, as such, has a fiduciary obligation to it. He receives a salary and bonuses from SCG and, therefore, has a vested interest in seeing Ko remain as manager. He has been Ko's lackey throughout this process. He overtly acted to intimidate anyone that tried to stop Ko's campaign to seize control of SCG.

62. For example, on approximately October 4, 2018, Foreman and Ko met with Joe at Steven's Restaurant in Woodridge. At the meeting, they stated that if DRYCO would not sell its interest in SCG to them, they would run SCG into the ground and force the DRYCO Members to utilize their life savings to protect their interest in it.

63. Foreman made the decision not to pay certain employees that questioned Ko's behavior. One of the employees was Steven Garner, with whom Mr. Foreman had a physical altercation. On Monday, October 15, 2018, SCG's CFO, Koreen Hux, arrived at work to find that someone had broken into her locked office. Foreman had ordered Phil Witz to break-in to Hux's office and steal numerous documents. When a regional sales manager in Dallas questioned Ko's behavior, Foreman flew down to Dallas to shut down the Dallas office. Foreman advised Ko to ignore SCG's obligations on the DRYCO Note; to ignore SCG's obligations to repay DRYCO pursuant to section 5.10 of the Operating Agreement; to refuse to deliver to the DRYCO the collateral securing the DRYCO Note; and to refuse to relinquish the equipment that DRYCO owns under section 5.10 of the Operating Agreement.

**k. DRYCO Assigned Its Membership Interest and Right to Repayment of the SCG Debt to the DRYCO Members.**

64.     On November 8, 2017, DRYCO transferred its full membership interest and rights in SCG to its members, Joseph Schroeder ("Joe"), Paul Matthews ("Paul") and John Schroeder ("John" and together the "DRYCO Members") in a Settlement, Buy-Out, and Mutual Release Agreement ("Buy-Out Agreement") signed by, *inter alia*, James Ko as Manager of SCG. Exhibit Q.  (For ease of reference, the DRYCO Members and DRYCO will be referred to collectively as "DRYCO" unless otherwise specified.)  Like SCG's tax returns, financial statement, and Operating Agreement, the Buy-Out Agreement acknowledges SCG's debt to DRYCO of more than $800,000.  *Id.*, p. 2.  The Buy-Out Agreement transferred DRYCO's interest in the debt from SCG and its full membership interest in SCG to the DRYCO Members: Joe Schroeder, Paul Matthews, and John Schroeder.  Ko submitted his signature to the Buy-Out Agreement to Paul Matthews via email on November 10, 2017.

65.     On the same date, DRYCO, CCI, and SCG entered into a Joint Written Consent of the Members and the Manager of Specialty Contents Group LLC ("Joint Consent").  Exhibit R.  The Joint Consent is signed by Ko both on behalf of SCG and CCI and by Joe Schroeder on behalf of DRYCO.  In the Joint Consent, CCI and SCG admitted the DRYCO Members as Members of SCG and required Ko as Manager to take all steps necessary to "effectuate any of the purposes of this Joint Written Consent and the transactions contemplated thereby."  *Id.*, p. 2.

66.     The Joint Consent also acknowledged SCG's debt of more than $800,000 to DRYCO and authorized Ko to execute a promissory note to the DRYCO Members.  *Id.*, p. 1. Thus, Ko acknowledged SCG's debt to DRYCO, subsequently transferred to the DRYCO Members, in at least the following documents: (i) SCG Operating Agreement, (ii) SCG's 2016 tax return, (iii) SCG's 2017 tax return, (iv) SCG's 2016 reviewed financial statement, (v) SCG's

20

2017 reviewed financial statement, (vi) the September 30, 2016 Promissory Note, (vii) the

September 30, 2016 Security Agreement, (viii) the Buy-Out Agreement, and (ix) the Joint

Consent.

67.     In yet another example of Ko's disloyalty to his business partners, Ko

subsequently breached the Joint Consent by refusing to sign the promissory note that it called

for.  Ko apparently believed that the debt would just go away if he refused to sign the promissory

note.

**l.    A Non-Exclusive List of Other Malfeasance Sanctioned by the Hansons.**

68.     Ko has also caused SCG to default on numerous contracts with important industry

participants.  For example, as of March 26, 2019, SCG owed $48,000 to a staffing company

called Integrity Trade Services; and as of April 15, 2019, SCG owed ServeMaster DSI, one of its

largest customers, more than $200,000.  These events have caused DRYCO reputational harm in

the industry because of its association to Ko and SCG.

69.     In the break-in to Hux's office, Ko and Foreman stole numerous documents from

the office; including, DRYCO business records having nothing to do with SCG.  Ko has refused

to return them.  Checks belonging to SCG were also stolen in the break-in, including unsigned

referral checks totaling approximately $70,000; signed referral checks totaling approximately

$15,000; two-party insurance checks to SCG totaling approximately $123,397.40; and other

checks written to SCG to be deposited in the bank totaling $40,872.74.  DRYCO has no

knowledge of what Ko has done with the checks and whether he is using them for personal

purposes or any purpose.

70.     On October 12, 2018, an SCG employee, Paul Garcia, discovered that Ko

installed spy software in an employee's computer for the purpose of allowing third parties to

covertly access SCG's accounting and payroll software. Ko installed software called Zoho Assist on the employee's computer. With this software, an individual who is not sitting at the computer, can take control of the computer and access all the data to which the computer has access, including the sensitive accounting data. Ko has staunchly refused to disclose the names of the people to whom he is providing this information or the purpose for doing so.

71.     On September 25, 2019, the State of Illinois filed a claim in Du Page County against SCG, Case No. 2019-CH-1095, to shut down SCG because Ko has refused to pay the drycleaner license fee.

72.     The Hansons have full knowledge of all this conduct and, yet, continue to support Ko in campaign against their own client, SCG.

### COUNT I – Violation of 18 U.S.C. §§ 1961, *et seq.*
### Racketeer Influenced and Corrupt Organizations Act
### (Directly by DRYCO and derivatively on behalf of SCG)

73.     Paragraphs 1 through 72 are incorporated as if fully restated here.

74.     Count I is asserted directly by DRYCO and derivatively on behalf of SCG.

75.     Pursuant to the RICO statute, "any person injured in his business or property by reason of a violation of [18 U.S.C. § 1962] may sue therefor…and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee…" 18 U.S.C. § 1964(c).

76.     At all relevant times, 18 U.S.C. § 1962 stated, in pertinent part:

a)  It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity…to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or

22

operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce…

b) It shall be unlawful for any person through a pattern of racketeering activity…to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity…

d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

77.     18 U.S.C. § 1961(5) defines "pattern of racketeering activity" as requiring "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years…after the commission of a prior act of racketeering activity."

78.     The RICO statute defines "racketeering activity" to include violations of 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), and the National Stolen Property Act (18 U.S.C.A. § 2314). 18 U.S.C. § 1961(1)(B).

79.     At all relevant times, 18 U.S.C. § 1341 made it unlawful for persons to use the United States mail to defraud persons of money or property.

80.     At all relevant times, 18 U.S.C. § 1343 made it unlawful for persons to use the wires of interstate commerce to defraud persons of money or property.

81.     A violation of § 2314 of the National Stolen Property Act (18 U.S.C.A. § 2314)
occurs when anyone "transports, transmits, or transfers" in interstate commerce any "goods,
wares, merchandise, securities, or money" worth more than $5,000, knowing that they have been
"stolen, converted or taken by fraud." To violate § 2314, the defendant need not participate in the
underlying unlawful scheme to defraud; the defendant must simply cause the transportation of
the funds, goods, or securities, knowing that they were procured by fraud.  § 2315 applies to
those who receive the goods or funds, knowing they were procured by fraud.

82.     All Defendants are "persons," as defined by 18 U.S.C. § 1961(3). Each of these
"persons" participated in the scheme defined herein as part of the "enterprise"—as defined by 18
U.S.C. § 1961(4).

83.     Defendants acted in concert with one another in perpetrating the scheme
described herein.

84.     In light of the foregoing, Defendants committed mail fraud as defined in 18
U.S.C. § 1341 and/or wire fraud as defined in 18 U.S.C. § 1343 by engaging in a scheme to
convert physical assets and funds belonging to SCG and DRYCO for the benefit of their new
business venture Service247.  The physical assets include pallet racking, IT hardware and
software, cleaning equipment, and vehicles located in Illinois, Texas, Wisconsin, and Missouri.
The funds include wire transfers of SCG funds paid to an account in Irving, Texas belonging to
the Nelson Group on November 16, 2018 ($25,000), January 8 ($5,000), April 15 ($14,500), and
May 9, 2019 ($6,270.15).  On information and belief, the funds also include checks transmitted
to the Nelson group in Texas, each for $22,500 on December 5, 2018, February 5 and 21, 2019,
and May 3, 2019.  The funds also include wire transfers to "lawyer" on October 22; November 2,
8, 16, 23, 30; December 7, 14, 21, 28; and January 4, each of $5,000, and one on August 20,

2019 for $10.140.  The "lawyer" account is believed to belong to the Hansons.  In other words,

SCG paid the Hansons $5,000 ***per week*** between October 22, 2018 and January 4, 2019.  As

described above, while the Hansons were supposed to represent SCG, they were actually serving

as Ko's personal attorney and aiding the transfer of assets and business to Service247 to SCG's

detriment.  The funds also include wire transfers of SCG funds on April 5 and 12, 2019 to

Shoken Law, who was unquestionably acting as Ko's personal attorney.

85.     All of the payments and equipment were ultimately to benefit Service247 and its

sponsors, Nelson and Keffer, in Texas.

86.     As directors of Service247, Nelson and Keffer ultimately received a portion of all

of these payments and the benefit of the equipment.

87.     All of the Defendants participated in the transfer of money to the Nelson Group in

Texas in violation of the National Stolen Property Act.

88.     Defendants conduct was a deliberate, organized scheme to defraud Plaintiffs and

use the illegally obtained money and equipment for the benefit of their own businesses and

operations.

89.     As a direct and proximate result of the foregoing, SCG and DRYCO were harmed

by Defendants' conduct described herein because they were denied the use of funds and

equipment that rightly belonged to them.

90.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to three times the damages

they sustained as a result of Defendants' illegal conduct described herein.

91.     Plaintiffs are also entitled to reasonable attorneys' fees and costs, pursuant to 18

U.S.C. § 1964(c).

WHEREFORE, Plaintiffs request a judgment against Defendants, jointly and severally, awarding damages in an amount to be determined at trial but not less than $1.5 million in out of pocket losses, not less than $1.0 million in lost profits, reputational damages, and prejudgment interest; treble damages pursuant to 18 U.S.C. § 1964(c), reasonable costs and attorneys' fees pursuant to 18 U.S.C. § 1964(c); and any other relief the Court deems right and just.

### Count II – Conversion Against All Defendants
### (Directly by DRYCO and derivatively on behalf of SCG)

92. Paragraphs 1 through 91 are incorporated as if fully restated here.

93. Count II is asserted directly by DRYCO and derivatively on behalf of SCG.

94. Defendants actively converted DRYCO and SCG's property.

95. Under sections 5.10(D) and (E), DRYCO owns substantially all of the equipment used by SCG. It is substantially all the equipment, because DRYCO put up all of the money for SCG to buy its equipment. Section 5.10(D) and (E) specifically states that the equipment belongs to DRYCO until DRYCO's costs of providing the Janes Ave. property and start-up costs have been reimbursed. DRYCO has an immediate and unconditional right to the immediate possession of its property.

96. DRYCO has an immediate and unconditional right to the immediate possession of the collateral as stated in the DRYCO Security Agreement.

97. Defendants each participated in wrongfully detaining these items.

98. Additionally, Defendants have taken cash and equipment from SCG as specified herein and converted it for their own use.

99. DRYCO and SCG have been damaged by Defendants' wrongful retention in an amount to be determined at trial, but not less than $1.5 million in out of pocket losses, not less than $1.0 million in lost profits, and reputational damages.

WHEREFORE, Plaintiffs request a judgment against Defendants, jointly and severally, awarding damages in an amount to be determined at trial but not less than $1.5 million in out of pocket losses, not less than $1.0 million in lost profits, and reputational damages, prejudgment interest, punitive damages, and any other relief the Court deems right and just.

### Count III – Civil Conspiracy Against All Defendants
### (Directly by DRYCO and derivatively on behalf of SCG)

100.    Paragraphs 1 through 99 are incorporated as if fully restated here.

101.    Count III is asserted directly by DRYCO and derivatively on behalf of SCG.

102.    Defendants conspired with Ko, SCG and CCI to convert DRYCO and SCG's property.

103.    Defendants reached an agreement, to benefit themselves, with Ko and CCI to convert DRYCO and SCG's property.

104.    DRYCO and SCG have an immediate and unconditional right to the immediate possession of its property. DRYCO also has an immediate and unconditional right to the immediate possession of the collateral as stated in the DRYCO Security Agreement. SCG has an immediate right to the cash payments that were funneled to Nelson Group and a equipment being used by the Service247 Defendants.

105.    DRYCO and SCG have been damaged by the conspiracy in an amount to be determined at trial, but not less than $1.5 million in out of pocket losses, not less than $1.0 million in lost profits, and reputational damages.

WHEREFORE, Plaintiffs requests a judgment against Defendants, jointly and severally, awarding damages in an amount to be determined at trial but not less than $1.5 million in out of pocket losses, not less than $1.0 million in lost profits, and reputational damages, prejudgment interest, punitive damages, and any other relief the Court deems right and just.

## Count IV – Inducement of Breach of Fiduciary Duty Against All Defendants
## (Directly by DRYCO and derivatively on behalf of SCG)

106.    Paragraphs 1 through 105 are incorporated as if fully restated here.

107.    Count IV is asserted directly by DRYCO and derivatively on behalf of SCG.

108.    As manager of SCG, Ko owed DRYCO and SCG fiduciary duties of (i) loyalty,

(ii) care, and (iii) good faith and fair dealing.  805 ILCS 180/15-3(a) through (d).

109.    Defendants colluded with Ko in a deliberate plan to harm DRYCO and SCG and

breach his fiduciary duties to both.

110.    Ko's disloyal, bad faith conduct includes (i) locking DRYCO's personnel, Paul

Matthews and Joe Schroeder, out of the Janes Avenue headquarters (despite the fact that they are

the leasing parties) and refusing them access to even their own business records; (ii) breaking

into Koreen Hux's office and stealing SCG checks and DRYCO's business records; (iii)

deliberately causing SCG to default on its rental arrangement for the purpose of putting financial

pressure on DRYCO; (iv) deliberately failing to repay DRYCO as required by sections 5.10(D)

and (E) of the Operating Agreement; (v) deliberately converting the equipment to which

DRYCO has title pursuant to sections 5.10(D) and (E) of the Operating Agreement; (vi)

deliberately causing SCG to fail to pay DRYCO as required under the DRYCO note; (vii)

converting the equipment and cash belonging to SCG and DRYCO; (viii) refusing to allow

DRYCO access to SCG's books and records; and (ix) diverting work and funds to SCG's

competitor, Claimplus.

111.    All of this conduct benefitted Ko because it enabled him to maintain his salary,

stay employed, and create new business opportunities for himself.

112.    Defendants each induced and/or participated in the breach.  Each of the

Defendants actively encourage Ko's conduct.

113.    All of this conduct benefitted Defendants.  It enabled the Service247 Defendants to exploit SCG for his own profit and that of his company; it enabled David Foreman to continue receiving a salary from SCG and present himself to the business community as an "executive"; and the Hansons were paid tens of thousands of dollars by SCG, despite their patently disloyal conduct toward both SCG and DRYCO.

114.    DRYCO and SCG have been damaged by the breaches of fiduciary duty, which were induced by Defendants, in an amount to be determined at trial, but not less than $1.5 million in out of pocket losses, not less than $1.0 million in lost profits, and reputational damages.

WHEREFORE, Plaintiffs requests a judgment against Defendants, jointly and severally, awarding damages in an amount to be determined at trial but not less than $1.5 million in out of pocket losses, not less than $1.0 million in lost profits, and reputational damages, prejudgment interest, punitive damages, and any other relief the Court deems right and just.

### Count V – Aiding and Abetting Breach of Fiduciary Duty Against All Defendants (Directly by DRYCO and derivatively on behalf of SCG)

115.    Paragraphs 1 through 114 are incorporated as if fully restated here.

116.    Count V is asserted directly by DRYCO and derivatively on behalf of SCG.

117.    As manager of SCG, Ko owed DRYCO and SCG, fiduciary duties of (i) loyalty, (ii) care, and (iii) good faith and fair dealing.  805 ILCS 180/15-3(a) through (d).

118.    Defendants knowingly and substantially assisted Ko in breaching his duties to DRYCO on an ongoing, regular basis.  Keffer and Nelson provided personnel to SCG so that Ko could wage this campaign; negotiated on behalf of Ko; and provided financial support, on information and belief.  The Hanson's acted as Ko's mouthpiece, beginning in the Summer of 2018 when they attempted to negotiate a payout from DRYCO to Ko (even though they were

SCG's attorneys, not Ko's) and continuing to this day. They have sent innumerable communications on Ko's behalf, given him legal advice, and attempted to give Ko's conduct the cover of legal advice. Foreman was Ko's boots on the ground for this campaign, doing all of the leg work that Ko finds so distasteful. In furtherance of Ko's campaign, among other tasks, Foreman intimidated SCG employees who questioned Ko's conduct; he coordinated the break-in to Koreen Hux's office to steal documents; he represented to third parties that DRYCO had no involvement with SCG; hired a locksmith to change the locks on the Janes Avenue property; signed checks on behalf of SCG, despite having no authority to do so; represented himself as a "manager" of SCG; and flew to Dallas to close the Dallas office when the regional sales manager questioned Ko.

119.    All of this conduct benefitted Defendants. It enabled the Service247 Defendants to exploit SCG; it enabled David Foreman to continue receiving a salary from SCG and present himself to the business community as an "executive"; and the Hansons were paid tens of thousands of dollars by SCG, despite their patently disloyal conduct toward both SCG and DRYCO.

120.    DRYCO and SCG have been damaged by the breaches of fiduciary duty, which were aided and abetted by Defendants, in an amount to be determined at trial, but not less than $1.5 million in out of pocket losses, not less than $1.0 million in lost profits, and reputational damages.

WHEREFORE, Plaintiffs request a judgment against Defendants, jointly and severally, awarding damages in an amount to be determined at trial but not less than $1.5 million in out of pocket losses, not less than $1.0 million in lost profits, and reputational damages, prejudgment interest, punitive damages, and any other relief the Court deems right and just.

### Count VI – Tortious Interference with Contract Against All Defendants

121.      Paragraphs 1 through 120 are incorporated as if fully restated here.

122.      Defendants tortiously interfered with DRYCO's contracts in numerous respects. They explicitly instructed Ko, SCG and CCI to breach contracts with DRYCO in the following respects: (i) Ko breached section 7.1 of the Operating Agreement by denying DRYCO access to SCG's books and records; (ii) Ko breached paragraph 5.7 of the operating agreement by subjecting DRYCO and its members to liability for breach of the Signature Bank Loan Agreements; (iii) CCI and Ko breached paragraph 5.10(D) and (E) of the Operating Agreement by causing SCG not to repay DRYCO and refusing to negotiate a reasonable repayment plan; (iv) SCG breached paragraph 5.10(D) and (E) by failing to repay DRYCO; (v) SCG breached the DRYCO Note by defaulting on the Signature Bank Loans; (vi) SCG breached the DRYCO Note by refusing to pay the amount due within ten days of notice of default; (vii) SCG breached the DRYCO Security Agreement by refusing to deliver the collateral upon default.

123.      DRYCO was damaged as a result of Defendants conduct in an amount to be determined at trial, but not less than $1.5 million in out of pocket losses, not less than $1.0 million in lost profits, and reputational damages.

WHEREFORE, Plaintiffs request a judgment against Defendants, jointly and severally, awarding damages in an amount to be determined at trial but not less than $1.5 million in out of pocket losses, not less than $1.0 million in lost profits, and reputational damages, prejudgment interest, punitive damages, and any other relief the Court deems right and just.

### Count VII – Breach of Fiduciary Duty Against the Hansons
### (Derivatively on Behalf of SCG)

124.      Paragraphs 1 through 123 are incorporated as if fully restated here.

125.      Count VII is asserted derivatively on behalf of SCG against the Hansons.

126.     As SCG's attorneys, the Hanson Law Group owed it fiduciary duties of the utmost good faith, loyalty, and fair dealing.

127.     The Hansons deliberately breached their fiduciary duties in numerous respects as detailed above in helping Ko wage his campaign against SCG and DRYCO.  They took all of these actions to benefit themselves, by receiving continued payments from SCG and setting up Service247 and Claimplus as potential clients, and to the detriment of their client, SCG.

128.     SCG has been damaged by the breach in an amount to be determined at trial, but not less than $1.5 million in out of pocket losses, not less than $1.0 million in lost profits, and reputational damages.

WHEREFORE, Plaintiffs request a judgment against Hanson Law Group awarding SCG damages in an amount to be determined at trial but not less than $1.5 million in out of pocket losses, not less than $1.0 million in lost profits, and reputational damages, disgorgement of all legal fees paid to the Hanson Law Group and all attorneys working with or for them, prejudgment interest, punitive damages, and any other relief the Court deems right and just.

### Count VIII – Professional Negligence against Hanson Law Group
### (Derivatively on behalf of SCG)

129.     Paragraphs 1 through 128 are incorporated as if fully restated here.

130.     Count VIII is asserted derivatively on behalf of SCG.

131.     The Hansons were SCG attorneys.

132.     In providing legal advice to SCG, they were, at a minimum, unforgivably negligent in allowing Ko, Foreman, and the Service247 Defendants to raid SCG without ever asserting any claims on SCG's behalf.

133.     SCG was damaged as a direct and proximate result of the Hanson Law Group's conduct through loss of equipment, money, other assets, and profits.

WHEREFORE, Plaintiffs request a judgment against Hanson Law Group awarding SCG damages in an amount to be determined at trial but not less than $1.5 million in out of pocket losses, not less than $1.0 million in lost profits, and reputational damages, disgorgement of all legal fees paid to the Hanson Law Group and all attorneys working with or for them, prejudgment interest, punitive damages, and any other relief the Court deems right and just.

DATE: May 29, 2020

Respectfully Submitted,
Joe Schroeder Legacy, LLC, f/k/a
DRYCO, LLC ("DRYCO"), Joseph
Schroeder, Paul Matthews, and John
Schroeder,

By: /s/ Daniel W. Tarpey
One of its attorneys

Daniel W. Tarpey
David G. Wix
Matthew M. Showel
Tarpey Wix LLC
225 W. Wacker Drive, Ste. 1515
Chicago, IL 60606
(312) 948-9090