## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JOE SCHROEDER LEGACY, LLC, et al.,    )
                                       )
              Plaintiffs,        )     No. 20 C 3201
    v.                               )
                                       )     Judge Virginia M. Kendall
SERVICE 247 of ILLINOIS, INC., et al.,    )
                                       )
              Defendants.     )

## MEMORANDUM OPINION AND ORDER

Plaintiffs Joe Schroeder Legacy, LLC, f/k/a DRYCO, LLC ("DRYCO"), Joseph Schroeder, Paul Matthews, and John Schroeder have brought claims against Defendants Thomas Keffer, Elizabeth Nelson, Nelson Group, Inc. d/b/a Claimplus, Service247 (together, the "Service247 Defendants"), and Hanson Law Group, LLP ("HLG") alleging harm to Plaintiffs' business. (*See* Dkt. 79). Plaintiffs' Second Amended Complaint ("SAC") brings federal claims under 18 U.S.C. §§ 1962(c)–(d) of the Racketeer Influenced and Corrupt Organizations Act ("RICO") as well as state law claims for conversion, civil conspiracy, inducement of breach of fiduciary duty, aiding and abetting breach of fiduciary duty, tortious interference with a contract, breach of fiduciary duty, professional negligence, and defamation. (*Id.* at ¶¶ 78–176). For the reasons discussed below, Defendants' Motions to Dismiss [87, 90] are granted as to the RICO claims, and the Court declines to grant supplemental jurisdiction over Defendants' remaining state law claims.

## BACKGROUND

On a motion to dismiss under Rule 12(b)(6), the Court accepts the complaint's well-pleaded factual allegations, with all reasonable inferences drawn in the non-moving party's favor, but not its legal conclusions. *See Smoke Shop, LLC v. United States*, 761 F.3d 779, 785 (7th Cir.

1

2014). Unless otherwise noted, the following factual allegations are taken from Plaintiff's Second Amended Complaint, (Dkt. 79) and are assumed true for purposes of this motion. *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016).

The individual Plaintiffs, through their entity DRYCO, founded Specialty Contents Group, LLC ("SCG") in 2015 which helps consumers and businesses restore personal property damaged by fires, floods, or similar calamities. (Dkt. 79 ¶ 3). Defendants Elizabeth Nelson and Thomas Keffer are the CEO and President, respectively, of Claimplus Corporation, a competitor of SCG. (*Id.* ¶ 4). Defendant David Foreman is an employee of SCG and was purportedly Nelson and Keffer's "inside man" at SCG. (*Id.*). Nelson and Keffer tried unsuccessfully to purchase SCG from DRYCO, and when that failed, they took over management of SCG with the help of Foreman and another individual, James Ko, who is co-owner of SCG. (*Id.*). From there, Defendants began the process of looting SCG of all its value and saddling SCG with unsustainable debts. (*Id.*). In furtherance of their scheme, Nelson and Keffer set up a series of companies to compete with SCG under the name "Service247," including Defendants Service247 of Illinois, Inc. and Service247 of Wisconsin, Inc. (together, "Service247"). (*Id.* ¶¶ 5–6). SCG retains counsel from Defendant HLG, but HLG allegedly actively and knowingly assisted Defendants in their raid of SCG to Plaintiffs' detriment. (*Id.* ¶ 7).

In 2015, DRYCO formed SCG with Ko, with DRYCO a 50% owner of SCG and Ko's entity called Countryside Cleaners, Inc. ("CCI") owning the other half. (*Id.* ¶ 20). DRYCO contributed 100% of the start-up capital to SCG and provided a space for SCG to maintain its headquarters, although SGC was to re-pay DRYCO for these costs. (*Id.* ¶ 21). Defendants ensured that the obligation to DRYCO was never repaid and instead converted the assets and opportunities of SCG for their benefit by handing them to Service247. (*Id.*).

In February 2017, DRYCO decided that the sole shareholder of CCI (the other Member of SCG), James Ko, would replace the original Manager of SCG, Burgess Watts. (*Id.* ¶ 24). Shortly thereafter, SCG began trending downward both operationally and financially. (*Id.*). Plaintiffs Joseph Schroeder and Paul Matthews advised Ko in June 2018 that he should no longer be the Manager of SCG and it was time that Ko and SCG part ways. (*Id.* ¶ 25). In response, Ko instead attempted to leverage powers he believed were granted him in the SCG Operating Agreement to intentionally injure DRYCO and SCG and to create business opportunities for himself and his Defendant co-conspirators. (*Id.*).

In August or September 2018, Keffer approached SCG about purchasing it. (*Id.* ¶ 27). DRYCO was not interested in selling its share, however, so Keffer turned to CCI. (*Id.*). In order to recruit Ko and Foreman into his plan to raid SCG, Keffer allegedly promised Ko and Foreman "something that looks like ownership" in the combined entities. (*Id.*). Keffer and Nelson quickly convinced Ko and Foreman to let them take over major management responsibilities at SCG and engage in various leadership activities. (*Id.* ¶ 28 (noting that Claimplus personnel began to hire, fire, and onboard SCG employees; administer SCG's health insurance plan; answer phones at SCG; perform IT duties; bookkeep; and process payroll information)). Since Keffer and Nelson took over management of SCG, SCG has left numerous creditors unpaid – including vendors and customers with whom DRYCO has longstanding relationships. (*Id.* ¶ 29).

Keffer and Nelson subsequently created Service247 for the purposes of looting SCG and using SCG's assets, customers, employees, and good will to compete against it. (*Id.* ¶¶ 29–30). Nelson and Keffer have converted funds from SCG, (*id.* ¶ 34); have caused SCG to divert physical assets, employees, and corporate opportunities to Service247, (*id.* ¶ 35); and have SCG employees working for Service247 using assets and equipment belonging to SCG, (*id.* ¶ 36) – all to their

competitive advantage against SCG, (*id.* ¶ 37).  HLG, while representing SCG, has colluded with the Defendants in allowing this behavior, in alleged violation of their fiduciary, legal and ethical duties to SCG and harming DRYCO.  (*Id.* ¶¶ 7, 38–60).

With regards to their RICO claims, Plaintiffs allege five predicate acts.  Plaintiffs first allege Wire and Mail Fraud, 18 U.S.C. §§ 1341, 1343, arguing that Defendants engaged with Ko to defraud Plaintiffs of physical assets, funds, and business opportunities in Illinois, and used email and telephones around the country to effectuate their plan.  (*Id.* ¶¶ 83–88).  Plaintiffs next allege another Wire and Mail Fraud violation under 18 U.S.C. §§ 1341, 1343, pertaining to business opportunities and equipment in Wisconsin.  (*Id.* ¶¶ 89–92).  The third set of predicate violations also arose under 18 U.S.C. §§ 1341, 1343 and relate to Defendants' and Ko's scheme to defraud SCG of equipment and business opportunities in Wisconsin.  (*Id.* ¶¶ 93–96).  The fourth set of predicate acts arise under the National Stolen Property Act 18 U.S.C.A. §§ 2314–15 (the "NSPA").  (*Id.* ¶¶ 97–100).  Plaintiffs claim that Defendants fraudulently caused SCG to wire funds across state lines to an account in Irving, Texas belonging to Defendant Claimplus.  (*Id.* ¶¶ 98–99).  Nelson and Keffer ultimately received the benefit of these payments.  (*Id.* ¶¶ 100).  The fifth set of predicate acts allege extortion in violation of 18 U.S.C. § 1951(a).  (*Id.* ¶¶ 101–15).  Defendants repeatedly threatened Plaintiffs with economic harm, attempting to force Plaintiffs to accede to their demands – including for Plaintiffs to renounce operational authority of SCG, pay Ko exorbitant sums of money, and sell their business interest in SCG to Defendants.  (*Id.* ¶ 103).  For example, Defendant David Foreman claimed that he would "run SCG into the ground" and cause the individual Plaintiffs to spend their life savings in court if they refused to sell to Keffer and Nelson.  (*Id.* ¶ 104).  In addition, the Hanson Law Group threatened Plaintiffs with legal action based on bogus claims of financial fraud – and demanded that Plaintiffs pay Ko off or give up their

interest in SCG to avoid litigation. (*Id.* ¶ 105). Defendants also conspired to cause SCG to stop paying its rent, knowing that Plaintiffs' company, DRYCO, would ultimately be liable under the lease. (*Id.* ¶ 110). In support of Plaintiffs' § 1962(d) claim, Plaintiffs allege that Keffer, Nelson, and Ko "clearly masterminded the enterprise," and the remaining Defendants "at a minimum" agreed to participate in and further the plan to defraud SCG. (*Id.* ¶118).

## LEGAL STANDARD

"To survive a motion to dismiss under 12(b)(6), a complaint must 'state a claim to relief that is plausible on its face.' " *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams*, 742 F.3d at 728 (quoting *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009)). "[I]t is not enough for a complaint to *avoid foreclosing* possible bases for relief; it must actually *suggest* that the plaintiff has a right to relief . . . by providing allegations that 'raise a right to relief above the speculative level.' " *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 777 (7th Cir. 2007) (citing *Twombly*, 550 U.S. at 555) (emphasis in original). The Court construes the complaint "in the light most favorable to the nonmoving party, accept[s] well-pleaded facts as true, and draw[s] all inferences in her favor." *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1146 (7th Cir. 2010). "[L]egal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to this presumption of truth." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (citing *Iqbal*, 566 U.S. at 678).

Rule 9(b) requires a party alleging fraud to "state with particularly the circumstances constituting fraud." FED. R. CIV. P. 9(b). This heightened pleading requirement was intended to protect against the "great harm to the reputation of a business firm or other enterprise a fraud claim

can do." *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007). Thus, pursuant to Rule 9(b), a plaintiff must "describe the 'who, what, when, where, and how' of the fraud—'the first paragraph of any newspaper story.' " *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016) (quoting *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009)).

## DISCUSSION

### A. Plaintiffs' § 1962(c) RICO Claim is Insufficiently Pled

Pursuant to § 1962(c), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Civil RICO, 18 U.S.C. § 1964(c), "empowers private parties to bring lawsuits against those engaged in racketeering activity when that activity has caused them harm." *Armada (Singapore) PTE Ltd. v. Amcol Int'l Corp.*, 885 F.3d 1090, 1093 (7th Cir. 2018) (citing *Rotella v. Wood*, 528 U.S. 549, 557 (2000)). In order to establish a violation of § 1962(c), a plaintiff must allege: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001); *see also Sabrina Roppo v. Travelers Com. Ins. Co.*, 869 F.3d 568, 587–88 (7th Cir. 2017).

#### 1. Racketeering Activity

A pattern of racketeering activity "requires the completion of at least two predicate acts." *Bielfeldt v. Graves*, 726 F. App'x 488, 490 (7th Cir. 2018) (citing *Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 963 (7th Cir. 2000), then citing 18 U.S.C. § 1961(5)). A plaintiff alleging predicate acts of fraud must do so with particularity. *See Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 729 (7th Cir. 1998) (citing FED. R. CIV. P. 9(b)). Additionally, the plaintiff must

6

assert "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Id.* (internal quotation marks omitted) (quoting *Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994)). As a result, "[a] complaint that attributes misrepresentations to all defendants, lumped together for pleading purposes, generally is insufficient." *E.g.*, *Flynn v. Exelon Corp.*, No. 19-cv-8209, 2021 WL 1561712, at \*4 (N.D. Ill. Apr. 21, 2021) (quoting *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990)); *see also, e.g.*, *Clay Fin. LLC v. Mandell*, No. 16-cv-11571, 2017 WL 3581142, at \*7 (N.D. Ill. Aug. 18, 2017) ("Where multiple defendants are involved in a case, 'the complaint should inform each defendant of the nature of his alleged participation in the fraud.' " (citing *Vicom*, 20 F.3d at 777–78)); *Freedom Mortg. Corp. v. Burnham Mortg., Inc.*, 720 F.Supp.2d 978, 994 (N.D. Ill. 2010) ("The complaint should not lump multiple defendants together, but should 'inform each defendant of the specific fraudulent acts that constitute the basis of the action against the particular defendant.' ").

The "two violations of a specified list of criminal laws . . . must exhibit continuity plus relationship." *Sabrina Roppo*, 869 F.3d at 589 (internal quotation marks omitted). "Related predicate acts have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* (quoting *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 828 (7th Cir. 2016) (quoting *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989)) (internal quotation marks omitted)). "Continuity is 'centrally a temporal concept.' " *Empress Casino Joliet Corp.*, 831 F.3d at 828 (quoting *H.J. Inc.*, 492 U.S. at 242). Analytically speaking, " '[c]ontinuity' is both a closed- and open-ended concept, referring either to a closed period of

repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* (quoting *H.J. Inc.*, 492 U.S. at 241).

In this case, even assuming Plaintiffs sufficiently pleaded relatedness and continuity, they must still plausibly state the predicate acts that they claim comprise Defendants' pattern of racketeering activity: violations of 18 U.S.C. §§ 1341, 1343 (wire and mail fraud); 18 U.S.C.A. §§ 2314–15 (interstate transportation of stolen property); and 18 U.S.C. § 1951(a) (extortion). (*See* Dkt. 79 ¶¶ 83–115). From the outset, the SAC generally treats all of the Defendants collectively as one and it frequently fails to differentiate between and among HLG and the Service247 Defendants. (*See, e.g., id.* ¶ 84 (alleging that "<u>Defendants</u> committed mail fraud" without further delineating allegations against any particular defendant) (emphasis added)). Such "lumping together" of defendants is not sufficient to state a RICO claim under § 1962(c), particularly under this element which requires allegations sufficient to demonstrate that each RICO Defendant engaged in at least two predicate acts. *See Goren*, 156 F.3d at 730; *see also, e.g., Green v. Morningstar Inv. Mgmt. LLC*, No. 17-cv-5652, 2019 WL 216538, at *3 (N.D. Ill. Jan. 16, 2019). In any case, for the reasons that follow, Plaintiffs fail to allege predicate acts of civil RICO.

### a. <u>Mail and Wire Fraud (Predicate Acts 1–3)</u>

The SAC fails to adequately plead violations of the mail or wire fraud statutes against HLG or the Service247 Defendants. To establish a predicate act of mail or wire fraud, Plaintiffs must specifically plead facts to show: (1) Defendants' participation in a scheme to defraud; (2) Defendants' commission of the act with intent to defraud; and (3) use of the mails or wire communication in furtherance of the fraudulent scheme. *United States v. Weimert*, 819 F.3d 351, 355 (7th Cir. 2016); *United States v. Faruki*, 803 F.3d 847, 852 (7th Cir. 2015); *United States v. Durham*, 766 F.3d 672, 678 (7th Cir. 2014). To that end, Plaintiffs must allege that Defendants

"made a material false statement, misrepresentation, or promise, or concealed a material fact." *Weimert*, 819 F.3d at 355 (citing *United States v. Powell*, 576 F.3d 482, 490 (7th Cir. 2009)); *see also Carpenter v. United States*, 484 U.S. 19, 27 (1987). In addition, the intent to defraud element requires allegations that Defendants acted willfully "with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another." *Weimert*, 819 F.3d at 355 (quoting *Faruki*, 803 F.3d at 853). *See also, e.g.*, *Dronby v. JP Morgan Chase Bank, N.A.*, 929 F. Supp. 2d 839, 849 (N.D. Ill. 2013) (explaining that plaintiffs must "identify which Defendants committed which acts of fraud [and] why they had an intent to defraud"); *Freedom Mortg. Corp.*, 720 F. Supp. 2d at 995 ("A RICO complaint 'must go beyond a showing of fraud and state the time, place and content of the alleged mail and wire communication perpetrating the fraud.' "); *IRN Payment Sys. v. Direct Furniture, LLC*, No. 07-cv-141, 2007 WL 2713366, at *6 (N.D. Ill. Sept. 12, 2007) (explaining that plaintiffs relying on mail and wire fraud to plead a RICO claim must "allege such particulars as who initiated the communication, when the communication took place, the contents of the communication, and how that communication furthered the scheme to defraud") (citing *R.E. Davis Chem. Corp. v. Nalco Chem. Corp.*, 757 F. Supp. 1499, 1516 (N.D. Ill. 1990)).

Plaintiffs attempt to plead wire or mail fraud against HLG by alleging that HLG (1) was an advocate for the conspirators; (2) opposed Plaintiffs' efforts to reclaim SCG from the conspirators; (3) denied Plaintiffs' access to SCG's financial records; (4) threatened to have the individual Plaintiffs arrested if they tried to enter SCG's office; and (5) refused to turn over SCG's equipment to the individual Plaintiffs. (Dkt. 97 at 4–5 (citing Dkt. 79 ¶¶ 54–59)). The SAC also generally alleges that "Defendants committed mail fraud . . . and/or wire fraud . . . by engaging with Ko in a scheme to defraud SCG and the individual Plaintiffs of physical assets" located in

Illinois, Wisconsin, and Texas.  (Dkt. 79 ¶¶ 84, 89, 93).  The SAC goes no further than this to specify HLG's participation in mail fraud or wire fraud.  It does not allege facts concerning any mail or wire communication by HLG that contained a false or misleading statement, or that Plaintiffs were deceived by any such communications by HLG.  Nor does it plead facts concerning HLG's intent to defraud Plaintiffs through mail or wire.  Therefore, the SAC is inadequate to put HLG on notice of the alleged misconduct.

For similar reasons, the SAC fails to establish that the Service247 Defendants committed mail or wire fraud.  Plaintiffs allege that Defendants converted SCG's physical assets and funds and burdened SCG with insurmountable debt. (Dkt. 97 at 7–8).  However, they fail to plead when or how Defendants "made a material false statement, misrepresentation, or promise, or concealed a material fact" to advance their purported scheme against Plaintiffs. *Weimert*, 819 F.3d at 355. Attempting to overcome this pleading failure, Plaintiffs cite *Perlman v. Zell*, 938 F. Supp. 1327, 1343–46 (N.D. Ill. 1996) for the proposition that any conversion or diversion of funds – and concealment or omission of material facts, in furtherance thereof – "violates the mail and wire fraud statutes, *even without any misrepresentation*." (Dkt. 97 at 7–8 (emphasis added)). *Perlman* is not on point here, however, because it entailed concealed conversion of funds by plaintiff's fiduciaries. *Perlman*, 938 F. Supp. at 1346; *see also id.* at 1344–45 (explaining that common law fraud by silence occurs where there is a fiduciary duty to disclose).  By contrast, Plaintiffs have not alleged that the Service247 Defendants are their fiduciaries such that they owe Plaintiffs a duty to disclose information.  Plaintiffs also simply fail to point to facts showing that the Service247 Defendants' alleged conversions were achieved through fraudulent means.  Therefore, the mail and wire fraud cannot form the basis of a civil RICO claim against the Service247 Defendants.

### b. **National Stolen Property Act (Predicate Act 4)**

An NSPA violation occurs when one "transports, transmits, or transfers," 18 U.S.C. § 2314, or "receives," *id.* § 2315, any "goods, wares, merchandise, securities, or money" worth $5,000 or more that have crossed state lines knowing that that property has been "stolen, converted or taken by fraud." *Id.* §§ 2314–15. Plaintiffs claim that "Defendants caused SCG to wire funds across state lines to an account in Irving, Texas belonging to Defendant, Claimplus[,]" on four occasions (Dkt. 79 ¶ 98). HLG points out that beyond this conclusory allegation, the SAC makes no allegations against HLG relating to the wire transfers. (Dkt. 88 at 7). Plaintiffs do not dispute this argument in their Opposition brief. (Dkt. 97 at 2–5). Thus, the NSPA does not supply a predicate act for Plaintiffs' RICO claim against HLG.

Plaintiffs' claims against the Service247 Defendants are also inadequate. The SAC alleges that Defendants Nelson and Keffer "converted funds from SCG." (Dkt. 79 ¶ 34; *see also id.* ¶ 98 ("Defendants knew that these funds were wrongfully converted from SCG for their benefit.")). However, this is a legal conclusion that the Court need not, and does not, accept as true at the 12(b)(6) stage. Plaintiffs do not otherwise allege how their funds were "stolen, converted or taken by fraud" as required by the NSPA. The SAC simply pleads that "[s]tatements from SCG's account at Chase Bank reveal wire transfers to an account . . . belonging to Claimplus." (Dkt. 79 ¶ 34). Even taking this claim as true, it fails to demonstrate how or why such transfers were acts of *theft*, for example, rather than legal exchanges in the ordinary course of business – however undesirable those exchanges might have been to Plaintiffs. This is particularly so here, where an entity in Claimplus's position would foreseeably receive compensation from SCG for the management and leadership services it provided to SCG. (*See, e.g.*, Dkt. 79 ¶ 28 (alleging that Keffer and Nelson convinced Ko and Foreman – who own 50% of SCG – "to let them take over

major management responsibilities at SCG," and that "Claimplus human resources personnel took over several functions of SCG, including hiring, firing, and onboarding SCG employees . . . . [as well as] administration of SCG's health insurance plan")). As such, Plaintiffs have not properly established that Defendants "knew that these funds were wrongfully converted" in violation of the statute. Per Plaintiffs' Opposition, another "fraudulent use of SCG's funds" came to pass when Keffer and Nelson caused SCG to pay its employees "while [those same SCG employees] were setting up Service247's operations." (Dkt. 98 at 10 (citing Dkt. 79 ¶¶ 32–33 (claiming several SCG employees were "on SCG's payroll while setting up Service247 to take SCG's business"))). Although this alleged activity may have been *undesirable* for an employer in Plaintiffs' position, the SAC simply fails to adequately plead under Rule 9(b) how or why this use of funds was at all *fraudulent*.

### c. <u>Hobbs Act Extortion (Predicate Act 5)</u>

The Hobbs Act, in relevant part, prohibits any extortion or attempt to extort that "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce." 18 U.S.C. § 1951(a). Under 18 U.S.C. § 1951(b)(2), extortion means "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." The Supreme Court in *Sekhar v. United States*, 570 U.S. 729 (2013) noted that the Hobbs Act's "obtaining of property" element requires proof of "the acquisition of property" – that is, proof that "the victim part[ed] with his property, and that the extortionist gain[ed] possession of it." *Id.* at 735 (internal quotations and citations omitted). In addition, the Hobbs Act proscribes the obtaining of property through the imposition of economic fear. The Seventh Circuit has explained: "If a defendant has no claim of right to property, the use of fear to obtain the property—including the fear of economic loss—may

. . . amount to extortion." *Rennell v. Rowe*, 635 F.3d 1008, 1012 (7th Cir. 2010). On the other hand, "where the defendant has a claim of right to property and exerts economic pressure to obtain that property, that conduct is not extortion and no violation of the Hobbs Act has occurred." *Id.* *See also United States v. Mitov*, 460 F.3d 901, 907 (7th Cir. 2006) (stating that a fear of economic harm need only be reasonable for Hobbs Act extortion); *United States v. Granados*, 142 F.3d 1016, 1020 (7th Cir. 1998) ("Extortion is the wrongful use of force or fear, including fear of economic harm, in order to obtain money or property from another person.").

Plaintiffs allege that HLG violated the Hobbs Act when it threatened to sue Plaintiffs for bogus claims of financial fraud unless Plaintiffs paid Ko "exorbitant amounts of money" or "g[a]ve up their interest in SCG for no other consideration." (Dkt. 79 ¶¶ 103–08). HLG argues that attorneys cannot be held liable for Hobbs Act extortion charges for threatening litigation. (Dkt. 88 at 7–8). Indeed, bringing or threatening to bring wrongful litigation in order to extract money from the target of the litigation is generally *not* considered to constitute Hobbs Act extortion. *See, e.g.*, *Deck v. Engineered Laminates*, 349 F.3d 1253, 1258 (10th Cir. 2003) (joining "multitude of other courts in holding that meritless litigation is not extortion under [the Hobbs Act]"); *Vemco, Inc. v. Camardella*, 23 F.3d 129, 134 (6th Cir. 1994); *Edelson PC v. The Bandas Law Firm PC*, No. 16-cv-11057, 2018 WL 723287, at *5 (N.D. Ill. Feb. 6, 2018) (collecting cases and explaining that the Seventh Circuit has not addressed this question). One rationale proffered for this approach is that it is best for the courts "and their time-tested procedures to reliably resolve [such] matter[s], separating validity from invalidity, honesty from dishonesty." *Edelson*, 2018 WL 723287, at *6 (quoting *United States v. Pendergraft*, 297 F.3d 1198, 1206 (11th Cir. 2002)) (internal quotation marks omitted). In addition, treating potentially abusive litigation tactics as criminal might adversely chill litigation activity by "subject[ing] almost any unsuccessful lawsuit to a colorable .

13

. . [RICO] claim." *Deck v. Engineered Laminates*, 349 F.3d at 1258 (affirming dismissal of RICO claims brought against defendant who threatened to "tie [the plaintiff] up in court" and allegedly brought meritless lawsuit using false and misleading allegations); *see also Pendergraft*, 297 F.3d at 1208 ("[P]rosecuting litigation activities as federal crimes would undermine the policies of access and finality that animate our legal system.").  Conversely, and relying solely on *United States v. Koziol*, 993 F.3d 1160 (9th Cir. 2021), Plaintiffs argue that HLG's threats of litigation constitute extortion.  The *Koziol* Court affirmed a criminal conviction for extortion under the Hobbs Act following defendant's threats of sham litigation.  *Id.* at 1168.  However, *Koziol* is distinguishable here as it pertains to criminal (rather than civil) RICO charges and was not decided on a motion to dismiss, but a motion for acquittal.  *Id.*  Moreover, *Koziol* opposes the "overwhelming weight of authority from other circuits, as well as from courts within this district" holding that threats of litigation do not amount to predicate acts in RICO cases.  *Edelson*, 2018 WL 723287, at *5.  Considering these precedents and their underlying rationales, the Court finds that HLG's alleged misconduct fails to support a Hobbs Act claim.

Nor do Plaintiffs adequately allege Hobbs Act extortion against the Service247 Defendants.  The SAC first states that the Service247 Defendants conspired to "cause SCG to stop paying [its] rent . . . knowing that DRYCO was [the] responsible party on the lease."  (Dkt. 79 ¶ 110; *see also* Dkt. 98 at 11).  This was allegedly part of the Service247 Defendants' plan to "leverage" Plaintiffs' fear of liability under the lease and strongarm Plaintiffs into giving up their interest in SCG to Keffer and Nelson.  (Dkt. 79 ¶¶ 53, 110; *see also* Dkt. 98 at 11).  Although the fear of economic harm may underpin a Hobbs Act claim, Plaintiffs have nonetheless failed to allege that the Defendants *actually obtained* extorted property.  *See* 18 U.S.C. § 1951(b)(2) (defining extortion as the "obtaining of property"); *see also, e.g.*, *Wacker Drive Exec. Suites, LLC*

*v. Jones Lang LaSalle Ams. (Ill.), LP*, No. 18-cv-5492, 2019 WL 2270000, at *10–11 (N.D. Ill. May 28, 2019) (discussing the "obtaining of property" prong and collecting cases). Indeed, though Plaintiffs argue that "Defendants *thought* the Plaintiffs *might* give up their interest in SCG due to the fear of liability under the lease," they stop short of alleging that the Plaintiffs did in fact give up their interest in the company as a result of that fear. (Dkt. 98 at 11 (emphasis added)).

Finally, the SAC alleges that the Defendants locked them out of their headquarters, (Dkt. 79 ¶ 111), in furtherance of Defendants' goal of pressuring Plaintiffs to give up legal control of SCG, (Dkt. 98 at 11). The SAC does not elaborate on this claim further – for example, by providing details like which Defendant locked Plaintiffs out of the facility; when that Defendant did so; or for how long a Defendant excluded Plaintiffs from the property. (*Compare id.* ("Defendants physically locked the individual Plaintiffs out of the Janes Avenue facility.") (emphasis added); *with id.* ¶¶ 59 ("The Hansons . . . threatened to have the individual Plaintiffs arrested if they attempted to enter SCG's . Janes Avenue facility.") (emphasis added), 138 ("Ko's disloyal, bad faith conduct includes . . . locking the individual Plaintiffs out of the Janes Avenue headquarters.") (emphasis added); *and* Dkt. 98 at 11 (claiming in Response brief that "Keffer and Nelson also locked the individual Plaintiffs out of SCG's offices.") (emphasis added)). Even presuming that the SAC sufficiently pleads that the Service247 Defendants locked Plaintiffs out of their property, the SAC still does not allege that Defendants obtained *extorted* property in violation of the Hobbs Act. According to Plaintiffs, the Service247 Defendants' goal in locking them out of the building "was to pressure Plaintiffs to give up legal control of SCG," (Dkt. 98 at 11), yet Plaintiffs do not claim to have relinquished control of SCG or any other property as a result of the Defendants' extortive actions. Because Plaintiffs have failed to adequately allege violations of the Hobbs Act, their extortion claims fail to establish predicate acts for the civil RICO claims.

15

In light of the foregoing, Plaintiffs have not pleaded the completion of at least two predicate acts. As such, their civil RICO claims necessarily fail. *Bielfeldt*, 726 F. App'x at 490. For the sake of completeness, the Court will also address the parties' arguments as to RICO's "enterprise" prong.

## 2. Conduct of an Enterprise

An enterprise includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). One type of enterprise, an "association-in-fact," consists of three structural features: (1) purpose; (2) relationships; and (3) longevity. *Sabrina Roppo*, 869 F.3d at 588 (quoting *Boyle v. United States*, 556 U.S. 938, 946 (2009)); *see also Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 656 (7th Cir. 2015) (explaining that an association-in-fact is a "joint enterprise where each individual entity acts in concert with the others to pursue a common interest"); *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 388 (7th Cir. 2010). Plaintiffs must identify people or entities that are distinct from the RICO enterprise itself. *Sabrina Roppo*, 869 F.3d at 588 (citations omitted); *United Food & Com. Workers Unions & Employers Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 853–54 (7th Cir. 2013). Put differently, the enterprise must not be the same entities named as defendants just referred to in a different way; there really must be a distinction between the defendants and the enterprise. *See Walgreen*, 719 F.3d at 854. Defendants also must have "conducted or participated in the conduct of the '*enterprise's* affairs,' not just [their] own affairs." *Id.* (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993)) (brackets omitted) (emphasis in original). Moreover, in this context, "conduct" means that the defendant operated or managed the enterprise and played some role in directing its affairs. *See Sabrina Roppo*, 869 F.3d at 589.

Here, Plaintiffs fail to distinguish between the illicit purpose of the alleged enterprise and the lawful purposes of the Defendants. Plaintiffs allege that the enterprise formed to "loot the assets, customer, employees, and business opportunities of SCG." (Dkt. 79 ¶ 1). For example, the Service247 Defendants allegedly "caus[ed] SCG's employees to set up the Service247 operations while still on SCG's payroll, effectively converting the compensation paid to these individuals." (Dkt. 98 at 4). However, there is nothing inherently nefarious about the Service247 Defendants' desire to maximize their market share and profits or attempts to acquire a competitor. It follows, then, that the SAC does not adequately state that the Service 247 Defendants participated in the affairs of the *enterprise* as opposed to pursuing their own affairs. *See Walgreen*, 719 F.3d at 854–55 (describing how each company was responsible for its own specific service in a commercial transaction and went about its own business within the process, rather than improperly taking over corporate operations for illegal means); *see also, e.g.*, *Green*, 2019 WL 216538, at *3 ("[T]wo or more companies conducting their own businesses and then working together to make money does not run afoul of RICO. On the other hand, two or more companies that go outside the bounds of their own affairs to financially profit in a new and unique business between them might violate the statute."). Plaintiffs also claim that HLG "was paid tens of thousands of dollars of SCG's money" and "[o]ne of HLG's attorneys . . . went on SCG's payroll." (Dkt. 97 at 8). According to Plaintiffs, these facts establish HLG's participation in the RICO enterprise. (*Id.*). However, these facts utterly fail to show that HLG was acting in concert on behalf of a RICO enterprise rather than pursuing its *own* interests in run-of-the-mill business transactions. *See, e.g.*, *Green*, 2019 WL 216538, at *3 ("[R]egular corporate . . . transactions show only that 'the defendants had a commercial relationship, not that they had joined together to create a distinct entity' ") (citing *Walgreen*, 719 F.3d at 855). Ultimately, Plaintiffs fail to demonstrate how the Defendants

advanced the purposes of an enterprise. The SAC also notably does not describe the organizational structure or hierarchy of the alleged enterprise, which courts have found to be fatal to civil RICO claims. *See Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 400 (7th Cir. 2009); *Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 675–77 (7th Cir. 2000).

In sum, although Plaintiffs maintain that their RICO allegations are sufficient, the SAC fails to identify predicate acts and does not identify the existence or organizational structure of an enterprise. These allegations are not enough to state a cause of action under RICO. Accordingly, Defendants' Motions to Dismiss [87, 90] are granted as to Count I.

### B. Plaintiffs' § 1962(d) RICO Claim is Insufficiently Pled

The SAC next brings a claim for a violation of § 1962(d). (Dkt. 79 ¶¶ 116–19 ("Through the conduct described above, all Defendants conspired to violate Section 1962(c) of RICO. While Keffer, Nelson and Ko clearly masterminded the enterprise, the remaining Defendants, at a minimum, each agreed to participate in furtherance of the plan to defraud SCG.")). Pursuant to § 1962(d), it is "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." Therefore, in addition to the four requirements of § 1962(c), subsection (d) further requires "that (1) the defendant[s] agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity, and (2) the defendant[s] further agreed that someone would commit at least two predicate acts to accomplish these goals." *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 823 (7th Cir. 2016) (internal citation omitted). As discussed above, Plaintiffs have not sufficiently alleged the existence of an enterprise or predicate acts underlying the civil RICO claim. Therefore, Plaintiffs similarly failed to state a valid claim pursuant to § 1962(d). *See Walgreen*, 719 F.3d at 856 ("Just as the complaint fails to allege that [Defendants] acted on behalf of the

18

[alleged] enterprise, it equally fails to allege that [Defendants] *agreed* to act on behalf of the enterprise.") (emphasis in original); *Goren*, 156 F.3d at 732 ("We have stressed that the touchstone of liability under § 1962(d) is an agreement to participate in an endeavor which, if completed, would constitute a violation of the substantive statute."); *see also, e.g.*, *Green v. Morningstar, Inc.*, No. 17-cv-5652, 2018 WL 1378176, at *9 n.3 (N.D. Ill. Mar. 16, 2018). Accordingly, Count II is dismissed.

## C. The Court Declines to Exercise Supplemental Jurisdiction Over the State Law Claims

Once Plaintiffs' RICO claims – the sole premises of federal jurisdiction here – are dismissed, there remain eight state law causes of action. However, where "the sole basis for invoking federal jurisdiction is non-existent . . . the federal courts should not exercise supplemental jurisdiction over his remaining state law claims." *Aztar Ind. Gaming*, 351 F.3d 294, 300 (7th Cir. 2003); *see also Doe–2 v. McLean Cnty. Unit Dist. No. 5 Bd. of Dirs.*, 593 F.3d 507, 513 (7th Cir. 2010) ("[W]hen a district court dismisses the federal claim conferring original jurisdiction . . . it relinquishes supplemental jurisdiction over any state-law claims under 28 U.S.C. § 1367(c)(3).' "); *Al's Serv. Ctr. v. BP Prods. N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010) (explaining same); *Groce v. Eli Lilly*, 193 F.3d 496, 501 (7th Cir. 1999) ("[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial."); *see also, e.g.*, *Drobny v. JP Morgan Chase Bank, NA*, 929 F. Supp. 2d 839, 850–51 (N.D. Ill. 2013) (declining to exercising supplemental jurisdiction over remaining state law claims after dismissing plaintiff's RICO claims); *Rennell v. Rowe*, No. 09-cv-2193, 2010 WL 99409, at *3 (N.D. Ill. Jan. 7, 2010) (same).

There are three exceptions to this general rule: (1) when the refiling of the state claims is barred by the statute of limitations; (2) where substantial judicial resource have already been

expended on the state claims; and (3) when it is clearly apparent how the state claim is to be decided. *Williams v. Rodriguez*, 509 F.3d 392 (7th Cir. 2007) (citing *Wright v. Associated Ins. Cos., Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994); *Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d 904, 906 (7th Cir. 2007)). None of these exceptions apply to Plaintiffs' state law claims of conversion, civil conspiracy, inducement of a breach of fiduciary duty, aiding and abetting breach of fiduciary duty, tortious interference with contract, breach of fiduciary duty, professional negligence, or defamation. First, because these claims are being dismissed on jurisdictional grounds, Illinois law gives Plaintiffs one year to refile them in state court. *See* 735 ILCS 5/13–217 ("[If] the action is dismissed by a United States District Court for lack of jurisdiction . . . then, whether or not the time limitation for bringing such action expires during the pendency of such action, the plaintiff . . . may commence a new action [in state court] within one year or within the remaining period of limitation, whichever is greater, after . . . the action is dismissed by a United States District Court for lack of jurisdiction."); *Davis v. Cook Cnty.*, 534 F.3d 650, 654 (7th Cir. 2008). Second, as the Court has disposed of the federal claims on a motion to dismiss, "substantial judicial resources" have not yet been committed to the case. *See, e.g., Davis*, 534 F.3d 650 (no substantial resources committed where federal claims dismissed at summary judgment phase). Lastly, it is not "clearly apparent" how Plaintiffs' state law claims will be decided.

Finding no justification to depart from the general rule requiring dismissal of supplemental state law claims in these circumstances, the Court declines to exercise supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367(c)(3).

## **CONCLUSION**

For the reasons set forth above, Defendants' Motions to Dismiss [87, 90] are granted. Plaintiffs' claims are dismissed with prejudice.


Virginia M. Kendall
United States District Judge

Date: February 10, 2022